LATHAM & WATKINS LLP
  Andrew M. Gass (SBN 259694)
  James K. Lynch (SBN 178600)
505 Montgomery Street, Suite 2000
San Francisco, California  94111-6538
Telephone:  +1.415.391.0600
Facsimile:  +1.415.395.8095
Email:   Andrew.Gass@lw.com
Email:   Jim.Lynch@lw.com

Attorneys for Defendant
PANDORA MEDIA, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FLO & EDDIE, INC., a California corporation, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PANDORA MEDIA, INC., a Delaware corporation; and DOES 1 through 100,<br><br>Defendants. | Case No. CV 14 07648-PSG (RZx)<br><br>Case Filed:   October 2, 2014<br>Trial Date:     None Set<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT PANDORA MEDIA, INC.'S SPECIAL MOTION TO STRIKE UNDER CALIFORNIA CODE OF CIVIL PROCEDURE § 425.16**<br><br>Date:        February 23, 2015<br>Time:        1:30 PM<br>Place:       Courtroom 880 - Roybal<br>Before:      Hon. Philip S. Gutierrez |

# TABLE OF CONTENTS

Page

Introduction...................................................................................................... 1

Background ...................................................................................................... 4

    A.    Facts Alleged......................................................................................... 4

    B.    The Anti-SLAPP Statute ....................................................................... 5

    C.    State And Federal Copyright Principles ............................................... 7

        1.    Federal Copyright Protection For Songs And Recordings ........................................................................... 7

        2.    State Copyright Protection For Unpublished Works ................................................................................ 10

Argument ...................................................................................................... 16

I.    Plaintiff's Claims Arise From Pandora's Protected Activity...................... 16

II.    Plaintiff Cannot Meet Its Burden To Prove A Probability of Prevailing On Its Claims ....................................................................... 18

    A.    California Copyright Protection Ended Decades Ago For All Of The Sound Recordings Plaintiff Is Suing Over ..................... 18

    B.    California Has Never Recognized A Public Performance Right For Sound Recordings.................................................................21

    C.    Plaintiff's Unfair Competition, Conversion, And Misappropriation Claims Fail Because Pandora Has Done Nothing Wrong.........................................................................23

# TABLE OF AUTHORITIES

Page

## CASES

*A&M Records, Inc. v. Heilman*,
  75 Cal.App.3d 554 (1977) ................................................................ 24

*Arista Records, LLC v. Launch Media, Inc.*,
  578 F.3d 148 (2d Cir. 2009) ........................................................ 9, 10

*Author's Guild, Inc. v. Hathi Trust*,
  755 F.3d 87 (2d Cir. 2014) .............................................................. 23

*Bagdasarian Prods., LLC v. Capitol Records, Inc.*,
  No. B217960, 2010 WL 3245795 (Cal. Ct. App. Aug. 18, 2010) .................. 21

*Blanc v. Lantz*,
  No. 547157, 1949 WL 4766 (Cal. Super. Ct. Sept. 30, 1949) ................... 19

*Bobbs-Merrill Co. v. Straus*,
  210 U.S. 339 (1908) ...................................................................... 22

*Bonneville v. Peters*,
  347 F.3d 485 (3d Cir. 2003) .............................................................. 9

*Briggs v. Eden Council for Hope & Opportunity*,
  19 Cal.4th 1106 (1999)................................................................. 6, 7

*Burlesci v. Petersen*,
  68 Cal.App.4th 1062 (1998) ............................................................. 25

*Capitol Records, Inc. v. Bluebeat, Inc.*,
  765 F. Supp. 2d. 1198 (C.D. Cal. 2010)............................................... 21

*Capitol Records, Inc. v. Erickson*,
  2 Cal.App.3d 526 (1969) ................................................................. 24

*Capitol Records, LLC v. Sirius XM Radio, Inc.*,
  No. BC 520981 (Cal. Super. Ct. Oct. 14, 2014)................................2, 21, 22

*Chabner v. United of Omaha Life Ins. Co.*,
  225 F.3d 1042 (9th Cir. 2000)........................................................... 25

*Cho v. Chang*,
  219 Cal.App.4th 521 (2013) ............................................................... 6

*Cinevision Corp. v. City of Burbank*,
  745 F.2d 560 (9th Cir. 1984) ............................................................ 17

*City of Colton v. Singletary*,
  206 Cal.App.4th 751 (2012) ............................................................... 6

*Cusano v. Klein,*
    473 Fed. Appx. 803 (9th Cir. 2012) ................................................................. 17

*Equilon Enters. v. Consumer Cause, Inc.,*
    29 Cal.4th 53 (2002) ..................................................................................... 5, 7

*Flo & Eddie, Inc. v. Sirius XM Radio, Inc.,*
    2014 WL 4725382 (C.D. Cal. Sept. 22, 2014) ........................... 3, 21, 22, 23

*Flo & Eddie, Inc. v. Sirius XM Radio, Inc.,*
    No. 13-cv-05784 (S.D.N.Y., Dec. 12, 2014) ................................................ 12

*Golan v. Holder,*
    132 S. Ct. 873 (2012) ............................................................................... 20, 23

*Hecimovich v. Encinal School Parent Teacher Org.,*
    203 Cal.App.4th 450 (2012) ......................................................................... 17

*In re Pandora Media,*
    6 F. Supp. 3d 317 (S.D.N.Y. 2014) ............................................................. 10

*Kane v. Hurley,*
    30 Cal.App.4th 859 (1994) ........................................................................... 20

*Klekas v. Emi Films, Inc.,*
    150 Cal.App.3d 1102 (1984) ......................................................................... 15

*Kramer v. Thomas,*
    2006 WL 4729242 (C.D. Cal., Sept. 28, 2006) ............................................ 23

*Le v. Sunlan Corp.,*
    2013 WL 5701393 (N.D. Cal. Oct. 18, 2013) ............................................... 6

*Lone Ranger Television v. Program Radio Corp.,*
    740 F.2d 718 (9th Cir. 1984) ........................................... 3, 19, 20, 24

*Makaeff v. Trump Univ., LLC,*
    715 F.3d 254 (9th Cir. 2013) ..................................................................... 5, 6

*McIntyre v. Double-A Music Corp.,*
    166 F.Supp. 681 (C.D. Cal. Sept. 30, 1958) ................................................ 19

*Newsham v. Lockheed Missiles & Space Co.,*
    190 F.3d 963 (9th Cir. 1999) ..................................................................... 1, 5

*No Doubt v. Activision Publ'g, Inc.,*
    192 Cal.App.4th 1018 (2011) ....................................................................... 18

*People v. Molina,*
    120 Cal.App.4th 507 (2004) ......................................................................... 20

*People v. Sisuphan,*
    181 Cal.App.4th 800 (2010) ......................................................................... 24

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

MPAs ISO SPECIAL MOTION TO STRIKE
CASE NO. CV14 07648-PSG (RZx)

*RCA Mfg. Co. v. Whiteman*,
    114 F.2d 86 (2d Cir. 1940) ...................................................................... 12

*Schad v. Borough of Mount Ephraim*,
    452 U.S. 61 (1981) ..................................................................... 1, 17

*Schwartz v. At the Cove Mgmt. Corp.*,
    2013 WL 1103479 (S.D. Cal. Mar. 14, 2013)................................... 4

*Stewart v. Rolling Stone LLC*,
    181 Cal.App.4th 664 (2010)............................................................ 17, 18

*Twin City Fire Ins. Co. v. Ennen*,
    64 Fed. Appx. 47 (9th Cir. 2003) ...................................................... 25

*Varian Med. Sys., Inc. v. Delfino*,
    35 Cal.4th 180 (2005)................................................................ 1, 5

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989) ........................................................................... 17

*Zacchini v. Scripps-Howard Broad. Co.*,
    433 U.S. 562 (1977) ........................................................................... 17

## STATUTES

17 U.S.C. § 10 ........................................................................................... 12

17 U.S.C. § 101 ........................................................................................... 9

17 U.S.C. § 102 ......................................................................................... 16

17 U.S.C. § 106 ............................................................................... 9, 10, 11

17 U.S.C. § 109 ......................................................................................... 26

17 U.S.C. § 114 ............................................................................... 10, 11, 27

17 U.S.C. § 301 ................................................................................ 8, 10, 16

17 U.S.C. § 302 ........................................................................................... 9

61 Stat. 656, c. 391 (July 30, 1947)........................................................ 12

1949 Cal. Stat., c. 921, § 4 ..................................................................... 16

Act of Feb. 3, 1831, c. 16, § 1, 4 Stat. 436 ............................................ 9

Act of July 9, 1947, c. 1107, 1947 Cal. Stat. 2546.............................. 15

Act to Amend and Consolidate the Acts Respecting Copyright,
    35 Stat. 1077, § 9 (March 4, 1909).................................................. 12

Cal. Bus. & Prof. Code § 17200 .................................................... 5, 29

Cal. Civ. Code § 980 (amended 1947, 1949, 1982) .......................................passim

Cal. Civ. Code § 983 (amended 1947, 1949, 1982) .................................passim

Cal. Civ. Proc. Code § 425.16 ...............................................................passim

Cal. Civ. Proc. Code § 425.17 ...................................................... 8, 21

Copyright Act of 1790, 1 Stat. 124, § 2............................................. 11

Digital Performance Right in Sound Recordings Act of 1995,
    Pub. L. No. 104-39, 109 Stat. 336.................................................. 9

Sound Recording Act of 1971,
    Pub. L. No. 92-140, 85 Stat. 391 .................................................. 9

**RULES**

Fed. R. Civ. P. 12(b)(6) ......................................................... 4

Fed. R. Civ. P. 56........................................................................ 4

**OTHER AUTHORITIES**

*General Revision of the Copyright Law*,
    Hearings before the H. Comm. on Patents, 72nd Cong. (1932)...................... 15

Leg. Assemb. B. 3483,
    1981-82 Reg. Sess. (Cal. 1982) .........................................3, 14, 15, 20

Leg. Assemb. B. 566,
    57th Gen. Sess. (Cal. 1947) ............................................... 13

*Performance Royalty*,
    Hearings before the S. Subcomm. on Patents, Trademarks and
    Copyrights of the S. Comm. on the Judiciary, 94th Cong. (1975)................... 15

Robert L. Bard *et. al*, *A Public Performance Right in Recordings:
    How to Alter the Copyright System Without Improving It*,
    43 Geo. Wash. L. Rev. 152 (1974)....................................................... 8

*The Digital Performance Right in Sound Recordings Act of 1995*,
    Hearing on H.R. 1506 Before the H. Judiciary Subcomm. on
    Courts & Intellectual Property,104th Cong. (1995)........................... 22

U.S. Copyright Office, *Performance Right in Sound Recordings*
    (1978)............................................................................ 12

U.S. Copyright Office, *Study No. 29: Protection of Unpublished
    Works* (1961) ........................................................... 10, 11

# INTRODUCTION

Defendant Pandora Media, Inc. ("Pandora"), the popular digital music-streaming technology company, files this "anti-SLAPP" motion to vindicate its First Amendment right to publicly perform artistic works in a manner entirely permitted by California law.

Plaintiff Flo & Eddie, Inc. ("Flo & Eddie") claims that Pandora violates California copyright law each time it plays certain recordings for its listeners.  That claim is baseless.  The "rights" Flo & Eddie assert simply do not exist, as California statutes and precedent have established for more than 100 years.  The actions that give rise to Pandora's alleged liability, however, are constitutionally protected; for decades, the Supreme Court has held that "programs broadcast by radio and television . . . [including] musical and dramatic works fall within the First Amendment guarantee." *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1981).  The anti-SLAPP statute protects such Free Speech conduct by striking rights-burdening claims at the outset of litigation, before discovery, unless the plaintiff establishes a probability of prevailing.  Cal. Civ. Proc. Code § 425.16(a), (b)(1); *Varian Med. Sys., Inc. v. Delfino*, 35 Cal.4th 180, 193 (2005) ("[T]he point of the anti-SLAPP statute is that you have a right *not* to be dragged through the courts because you exercised your constitutional rights.").  For the reasons discussed in this brief, Pandora respectfully submits that Plaintiff will not be able to make that showing.  Pandora thus seeks an order striking all of the causes of action in the Complaint under California Code of Civil Procedure section 425.16(b)(1).  *See Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 973 (9th Cir. 1999) (allowing use of California anti-SLAPP statute in federal court).

This case is one in a series of related Flo & Eddie lawsuits.  In each, they embrace the theory that a California state law copyright is infringed every time anyone publicly performs a sound recording made before 1972—whether over terrestrial radio, in a restaurant, via the Internet, or in any other medium.

1  Notwithstanding their failure to assert any such right in the 47 years that have

2  passed since the recordings at issue in this case were created, Flo & Eddie claim

3  that this has *always* been the law of California.  Pandora, they allege, is thus liable

4  for tens of millions of dollars in damages, presumably along with everyone else in

5  Los Angeles, San Francisco or Oakland who has ever broadcast any recording by

6  the Beatles, Jimi Hendrix, or Janis Joplin.

7  That is all wrong.  A complete rather than selective review of the relevant

8  statutes simply disproves Plaintiff's theory.  At the time Flo & Eddie made their

9  classic records, California law provided—by statute, in Civil Code section

10  983(a)—that as soon as the owner of a copyrightable work "publishes it, the same

11  may be used in any manner by any person, without responsibility to the owner

12  insofar as the law of this state is concerned."  This means that, like many states in

13  that era, California's copyright regime was limited to protecting *unpublished* works

14  (in order to complement but not duplicate federal law, which protected only

15  *published* works).  As a result, when the Turtles' "Happy Together" hit record

16  store shelves in 1967, its state law copyright protection ended.[1]  In copyright

17  jargon, a "divestive publication" occurred.

18  Flo & Eddie have never asserted the view that any legislative action—

19  including the 1982 statute under which they have sued Pandora—targeted all

20  recordings whose California copyrights had lapsed, and imbued them with a *new*

21  term of protection.  Instead, they have asserted, over and over, that the suggestion

22  "that the [public] performance right did not exist in California" for their popular

23  recordings during the 1960s and '70s is "wrong[]"; "[i]t did," they unambiguously

24  claim.  *See* Reply in Supp. of Summ. Judg. (Dkt. 111) at 17, *Flo & Eddie, Inc. v.*

25  *Sirius XM Radio, Inc.*, No. CV13-05693 PSG, 2014 WL 4725382, (C.D. Cal. Sept.

26

27  [1] Flo & Eddie allege that they own the rights to the Turtles' catalogue of sound

28  recordings.  They predicate their purported claims on state law statutes and judicial
   doctrine because (as discussed below, and as Plaintiff does not dispute) Congress
   chose *not* to grant federal copyright protection to such works.

22, 2014).  But that is impossible.  California law expressly stated that publishing a work *extinguished its state copyright protection*.  Binding Ninth Circuit precedent holds that under the law in effect when the Turtles were a band, the "commercial distribution of . . . recordings"—the specific type of work at issue in this litigation—had precisely this "divestive" effect, terminating their California copyrights.  *See Lone Ranger Television v. Program Radio Corp.*, 740 F.2d 718, 726 (9th Cir. 1984).

That resolves this case.  Plaintiff filed suit under a statutory provision, Civil Code section 980(a)(2), that was expressly intended to do nothing more than "*maintain* rights and remedies in sound recordings fixed prior to February 15, 1972."  *See* Leg. Assemb. B. 3483, 1981-82 Reg. Sess. (Cal. 1982) ("1982 Leg. Hist.") (attached hereto as App. Ex. 1), at 14 (emphasis added).  In enacting that law, the Legislature *narrowed* the pre-existing version of section 980, which had been on the books for 100 years.  The amendment did not and could not have the effect of fundamentally transforming California's state copyright system from one that applied only to works that had not yet been disseminated in commerce to one that, suddenly and without warning or attention, *resurrected* previously extinguished state copyright protection for decades' worth of recordings.  Flo & Eddie's section 980(a)(2) claim thus fails.[2]

Yet that claim is the central pillar of Plaintiff's case; knocking out the section 980 allegations means the rest of the causes of action in the Complaint fall as well.  Flo & Eddie allege that Pandora has engaged in "unfair competition," "misappropriation," and "conversion"—but these ancillary claims could work only if California law afforded a "public performance" right for published sound recordings in the first place.  By the same token, Plaintiff's claims that Pandora has unlawfully "reproduced" or "distributed" state law copyright-protected sound

---

[2] *Cf. Sirius XM Radio, Inc.*, 2014 WL 4725382; *Capitol Records, LLC v. Sirius XM Radio, Inc.*, No. BC 520981 (Cal. Super. Ct. Oct. 14, 2014).

1  recordings also fail as a matter of law.  Again, Flo & Eddie's sound recordings

2  enjoy no state law copyright protection because when they were released, all such

3  protection lapsed upon publication, and nothing since has restored it.

4          Flo & Eddie's Complaint is legally defective on its face and burdens

5  Pandora's First Amendment rights.  The Court should thus grant this motion.[3]

6                              **BACKGROUND**

7      **A.    Facts Alleged**

8          Pandora "is one of the leading operators of an internet radio service in the

9  United States."  Compl. ¶ 1.  It provides "a personalized music experience" for

10  200 million people, "wherever and whenever they want to listen to radio on a wide

11  range of smart phones, tablets, traditional computers, car audio systems and a

12  range of other internet-connected devices."  *Id*.  Pandora generally obtains

13  copyright licenses to deliver music to its users, when required by law—including

14  licenses for the "musical works" (*i.e.* songs) embodied in all recordings, whenever

15  they were made.  *Id*. ¶ 2.  Pandora does not, however, take an additional license

16  specifically for the sound recordings, themselves, when the recordings were made

17  before 1972.  *Id*.

18          Flo & Eddie say they own state law copyrights in a number of sound

19  recordings made by the band The Turtles.  *Id*. ¶ 9.  They have filed a putative class

20  action against Pandora on behalf of "[a]ll owners of sound recordings of musical

21  performances that initially were 'fixed' (*i.e.*, recorded) prior to February 15, 1972,

22  which sound recordings were reproduced, performed, distributed and/or otherwise

23  exploited by Pandora . . . in California."  *Id*. ¶ 22.

24  _____

25  [3] Federal courts recognize a distinction between anti-SLAPP motions in the nature
    of a Fed. R. Civ. P. 12(b)(6) motion, which assert defenses as a matter of law, and
26  anti-SLAPP motions in the nature of a summary judgment motion under Fed. R.
    Civ. P. 56.  *See, e.g., Schwartz v. At the Cove Mgmt. Corp.*, 2013 WL 1103479, at
27  *1-2 (S.D. Cal. Mar. 14, 2013).  Discovery is allowed to contest the latter but not
    the former.  *Id*.  This anti-SLAPP motion is in the nature of a 12(b)(6) motion, in
28  that takes all facts alleged in the Complaint as true, and mounts only legal (not
    factual) defenses.

1    In substance, Plaintiff is principally concerned with the fact that Pandora

2    streams recordings made before 1972 to the public (*id.* ¶¶ 16-17), and that in order

3    to do so, Pandora has allegedly "reproduced and copied and continues to reproduce

4    and copy pre-1972 sound recordings" (*id.* ¶ 17).  This conduct, Flo & Eddie claim,

5    gives rise to four discrete causes of action: violations of California Civil Code

6    section 980(a)(2) (Compl. ¶¶ 29-34); misappropriation (*id.* ¶¶ 35-43); unfair

7    competition under California Business and Professions Code section 17200

8    (Compl. ¶¶ 44-51); and conversion (Compl. ¶¶ 52-58).  They seek at least $25

9    million in damages on behalf of the class, along with various forms of equitable

10   relief, including "a temporary, preliminary, and permanent injunction" preventing

11   Pandora from playing any recordings made before 1972.  *Id.* at 14-15, ¶¶ B, C, E.[4]

12   **B.    The Anti-SLAPP Statute**

13       California enacted an "Anti-SLAPP" statute in 1992.  *Equilon Enterprises,*

14   *LLC v. Consumer Cause, Inc.*, 29 Cal.4th 53, 59-60 (2002).[5]  Its purpose is to

15   protect the exercise of First Amendment rights against the burdens imposed by

16   legal claims that are not reasonably likely to prevail.  *Varian Med. Sys.*, 35 Cal.4th

17   at 192.  Under established Ninth Circuit precedent, defendants are permitted to file

18   anti-SLAPP motions in federal court cases governed by California law.  *Newsham*,

19   190 F.3d at 973; *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 261 (9th Cir. 2013).

20       The anti-SLAPP statute creates a "special motion to strike" applicable to

21   causes of action that would impose liability based on the exercise of the

22   constitutional right to Free Speech.  California Code of Civil Procedure section

23   425.16(b)(1) provides:

24            A cause of action against a person arising from any act of that

25            person in furtherance of the person's right of petition or free

26   _____

27   [4] Pursuant to Local Rule 7-3, counsel for both parties met and conferred regarding
     this Motion telephonically on December 12, 2014.

28   [5] "SLAPP" is an acronym for "strategic lawsuit against public participation."
     *Equilon*, 29 Cal.4th at 57.

1    speech under the United States Constitution or the California

2    Constitution in connection with a public issue shall be subject

3    to a special motion to strike, unless the court determines that

4    the plaintiff has established that there is a probability that the

5    plaintiff will prevail on the claim.

6  Defendants may file anti-SLAPP motions as a matter of right within 60 days of the

7  service of a complaint.  Cal. Civ. Proc. Code § 425.16(f); *Le v. Sunlan Corp.*, 2013

8  WL 5701393, at *3 (N.D. Cal. Oct. 18, 2013).

9        An anti-SLAPP motion proceeds in two steps: First, "the moving defendant

10  must make a prima facie showing that the plaintiff's suit arises from an act in

11  furtherance of the defendant's constitutional right to free speech."  *Makaeff*, 715

12  F.3d at 261.  Courts sometimes frame this question as whether the defendant can

13  show that the plaintiff's claim would burden "protected activity."  *See, e.g.*, *City of

14  Colton v. Singletary*, 206 Cal.App.4th 751, 766 (2012).  Second, "[t]he burden then

15  shifts to the plaintiff . . . to establish a reasonable probability that it will prevail on

16  its claim," despite the claim's effect on "protected activity."  *Makaeff*, 715 F.3d at

17  261-62.  If the defendant shows that the plaintiff's claims target "protected

18  activity," and the plaintiff fails to carry its burden to show a probability of

19  prevailing, then the court strikes the plaintiff's offending claims in whole or in

20  relevant part.  *See id.*; *Cho v. Chang*, 219 Cal.App.4th 521, 526-27 (2013).

21        The anti-SLAPP statute defines "protected activity" very broadly.  It covers

22  not just First Amendment conduct addressed to *political* issues, but also

23  constitutional rights at stake in "events that transpire between private individuals."

24  *Briggs v. Eden Council for Hope & Opportunity*, 19 Cal.4th 1106, 1116 (1999).

25  Thus when California adopted a number of exemptions from the anti-SLAPP law's

26  coverage—including a limited category of "action[s] brought solely in the public

27  interest"—the Legislature expressly *carved out of those exemptions* suits asserting

28  liability from the dissemination of artistic works.  Specifically, California Code of

Civil Procedure section 425.17(d)(2) provides that there is *no* exemption from the anti-SLAPP statute for "[a]ny action against any person or entity based upon the creation, dissemination, exhibition, advertisement, or other similar promotion of any dramatic, literary, musical, political, or artistic work."

Both the Legislature and the Supreme Court have emphasized that the anti-SLAPP law must be read generously in favor of the constitutional rights it protects. In response to several unduly narrow judicial interpretations of the statute, the Legislature amended its preamble in 1997 to add a directive that section 425.16 "be construed *broadly*." *See id.* at 1119; Code Civ. Proc. § 425.16(a) (emphasis added). The California Supreme Court has honored that instruction, consistently rejecting efforts by litigants and lower courts to pinch the anti-SLAPP statute's scope. *See, e.g., Equilon*, 29 Cal.4th at 57 (defendant need not show that plaintiff's action "was brought with the *intent* to chill the defendant's exercise of constitutional speech or petition rights") (emphasis added); *Briggs*, 19 Cal.4th at 1119 (Courts "whenever possible, should interpret the First Amendment and section 425.16 in a manner favorable to the exercise of freedom of speech, not its curtailment.") (quotation marks omitted).

## C.    State And Federal Copyright Principles

This case involves the interrelationship between state and federal copyright laws. By and large, copyright protection in the United States is the province of the federal government. *See* 17 U.S.C. § 301(a). But Congress has carved out limited categories in which states can choose whether (and to what extent) to protect particular types of works. "Sound recordings" made before February 15, 1972 are one such category. 17 U.S.C. § 301(c).

### 1.    Federal Copyright Protection For Songs And Recordings

Federal copyright law has always treated *songs* differently from *recordings* of songs. Songs (also known as "musical works") are the notes and lyrics written by the composer and author. Since 1831, songs have enjoyed federal copyright

1    protection.  *See* Act of Feb. 3, 1831, c. 16, § 1, 4 Stat. 436.  Regardless of the

2    outcome of this case, it is definitely, beyond dispute, a copyright infringement—

3    under federal law—for someone to take a hit *song* by the Turtles from the 1960s

4    and reproduce, distribute, or publicly perform it without a license.[6]  *See* 17 U.S.C.

5    § 106.  "Performing rights societies" like ASCAP, BMI and SESAC exist for the

6    purpose of collecting license fees from terrestrial radio stations and companies like

7    Pandora to pay to the rightsholders of these works every time a song gets publicly

8    performed.  *See* 17 U.S.C. § 101 (defining "performing rights society").  Those

9    federal "musical work" copyrights apply to songs recorded before 1972 no less

10   than songs recorded today, and last as long as the life of the author plus seventy

11   years.  *See* 17 U.S.C. § 302.  Flo & Eddie do not allege that Pandora has failed to

12   pay any required "musical work" royalties.

13         Historically, there was *no* federal copyright protection for the *sound*

14   *recording* that captured a particular rendition of a musical work.  In response to

15   concerted lobbying by the record industry, Congress changed that policy in the

16   Sound Recording Act of 1971.  *See* Sound Recording Act of 1971, Pub. L. No. 92-

17   140, 85 Stat. 391 ("1971 Act"); Robert L. Bard *et. al*, *A Public Performance Right*

18   *in Recordings: How to Alter the Copyright System Without Improving It*, 43 Geo.

19   Wash. L. Rev. 152, 153-54 (1974).  Congress chose, however, to impose

20   significant limitations on the new sound recording copyright it created.  First, a

21   sound recording copyright, unlike a musical work copyright, did not grant the

22   owner any exclusive right of "public performance"—so playing a sound recording

23   over the radio triggered no obligation to pay a royalty (beyond the one already

24   owed to the musical work copyright holder).  *Bonneville v. Peters*, 347 F.3d 485,

25   487 (3d Cir. 2003).  Second, even the limited rights that were available would

26

27   ─────────────
     [6] Assuming, of course, that the Turtles or whoever the relevant rightsholders are
     complied with all necessary formalities to establish and preserve their federal

28   copyrights.  And provided that the work was originally published after 1922, since
     federal copyright protection has expired for all material published before that date.

apply only to sound recordings "fixed," *i.e.*, made, after February 15, 1972. 17 U.S.C. § 301(c).

In 1995, Congress took a step to broaden the legal protection for those sound recordings, granting them a form of "public performance" right for the first time. *See* Digital Performance Right in Sound Recordings Act of 1995, Pub. L. No. 104-39, 109 Stat. 336 ("DPRSA"). But even so, it restricted the right to cover only public performances delivered via *digital transmission*. *See* 17 U.S.C. § 106(6). So today, playing the identical sound recording on (a) a terrestrial radio station, and (b) a satellite radio station like Sirius XM or an internet streaming service like Pandora, implicates distinct sets of underlying federal rights and royalty obligations. The radio station pays *zero*—because, as noted above, Congress has repeatedly chosen over many years not to create a generally applicable public performance right for sound recordings. *Compare* 17 U.S.C. § 106(4) *with* § 106(6). Sirius and Pandora, by contrast, both owe royalties, under different terms of a complex statutory licensing regime adopted in the DPRSA, and codified at 17 U.S.C. section 114. *See Arista Records, LLC v. Launch Media, Inc.*, 578 F.3d 148, 153-54 (2d Cir. 2009).

The digital music streaming service that Pandora provides thus must, and does, comply with those statutory requirements. Flo & Eddie do not allege otherwise—yet they claim that Pandora is liable not just for "publicly performing," but also for "distributing" sound recordings, which is generally understood to mean selling or transferring ownership of copies of the works. *See* 17 U.S.C. § 106(3). Under the requirements for a section 114 statutory license, however, Pandora is specifically prohibited from delivering copies of (federally protected) sound recordings to users that they can listen to on-demand.[7] Under that statutory

---

[7] Wary of the possibility that letting people stream particular songs at particular times could cannibalize record sales, Congress ensured that the section 114 compulsory license would be available only to services that do not allow users to hear precisely the track they want when they want it. *See Arista Records*, 578 F.3d at 154. In technical terms, the section 114 license is available to a music-streaming

restriction, a company like Pandora may not, as a matter of law, give its customers the ability to receive, "on request, a transmission of a particular sound recording." *See In re Pandora Media*, 6 F. Supp. 3d 317, 332 (S.D.N.Y. 2014). Because Pandora provides a "non-interactive" service, it does not "distribute" sound recordings to anyone.

### 2. State Copyright Protection For Unpublished Works

From the time of the first U.S. copyright law, adopted by the first U.S. Congress in 1790, federal statutory copyright protection was historically available only for *published* works. *See* Copyright Act of 1790, 1 Stat. 124, § 2 (conditioning copyright on the "publishing" of a map, chart or book).[8] This was the rule for most of the 20th century, including the period when the Turtles were recording songs. *See* Act to Amend and Consolidate the Acts Respecting Copyright, 35 Stat. 1077, § 9 (March 4, 1909) ("1909 Act") ("[A]ny person entitled thereto by this Act may secure copyright for his work by publication thereof with the notice of copyright required by this Act[.]"); 61 Stat. 656, c. 391 (July 30, 1947) (recodifying the publication requirement in 17 U.S.C. § 10).[9]

That left a void, of course, for *unpublished* works: what rights would an author have if someone purloined her manuscript from her nightstand drawer and started selling it? The answer developed through a combination of judicial decisions recognizing a "common law" copyright in unpublished works, and state statutes codifying those rights. *See generally* U.S. Copyright Office, *Study No. 29: Protection of Unpublished Works* (1961) ("*1961 Report*").

---

[8] In fact, this tradition dated all the way back to the world's first modern copyright law, England's Statute of Anne, enacted in 1710. *See* U.S. Copyright Office, *Study No. 29: Protection of Unpublished Works*, at 2 (1961) ("[T]he Statute of Anne dealt only with copyright in books after publication[.]").

[9] It was not until the 1976 Copyright Act that Congress extended federal protection to unpublished works.

provider only if it is *not* an "interactive service," as defined by 17 U.S.C. section 114(f)(7). *See* 17 U.S.C. § 114(d)(2)(A)(i) (statutory license available only for non-interactive services).

California was one of the states to address the issue by statute.  In 1872, the Legislature adopted Civil Code section 980, which provided:

> The author of any product of the mind, whether it is an invention, or a composition in letters or art . . . has an exclusive ownership therein, and in the representation or expression thereof.

Cal. Civ. Code § 980 (1874) (amended 1947, 1949, 1982).  The same law, however, limited that protection to the period *before* a work was "public"; Civil Code section 983 read:

> If the owner of a product of the mind intentionally makes it public, a copy or reproduction may be made public by any person, without responsibility to the owner, so far as the law of this State is concerned.

Cal. Civ. Code § 983 (1874) (amended 1947, 1949, 1982).  This restriction mirrored the judicial treatment of common law copyrights, which universally held that the "publication" of a work divested its common law protection.  *See 1961 Report* at 1 ("It is the accepted rule of law that the property right which the author has under the common law is terminated by publication of the work.").

When sound recordings started gaining commercial traction in the early 20th century, they were not subject to federal copyright protection, as discussed above.  It thus became an important question to litigants precisely what it meant for a record to be "ma[de] public" (under the 1872 California statute) or "published" (under the common law).  That event, whenever it occurred, would extinguish common law (or California statutory) copyright protection—and no federal copyright protection would take its place.

For many years, the leading judicial opinion on the issue of when publication divested a sound recording of its common law copyright was *RCA Mfg.*

1  *Co. v. Whiteman*, 114 F.2d 86 (2d Cir. 1940), written by Judge Learned Hand.[10]  In

2  that case, RCA filed suit to enjoin "the broadcasting of phonograph records of

3  musical performances" over the radio by the W.B.O. Broadcasting Corporation.

4  *Id*. at 87.  Seeking specifically to ensure license payments for radio plays, RCA

5  had put a legend on its records saying that they were "Only For Non-Commercial

6  Use on Phonographs in Homes."  *Id*.  That tactic, the Second Circuit ruled, did not

7  work: "the 'common-law' property in these performances ended with the sale of

8  the records and that … restriction did not save it."  *Id*. at 89.  Selling the

9  phonographs in commerce was a "'publication' in the sense that that destroys the

10  'common-law property'" interest at stake.  *Id*. at 88-89.  This was so, Judge Hand

11  wrote, regardless of the fact that sound recordings could not be protected under the

12  1909 Act (the federal copyright law then in effect); "the fact that they are not

13  within the act should make no difference," he explained.  *Id*. at 89.  "[W]e see no

14  reason why the same acts that unconditionally dedicate the common-law copyright

15  in works copyrightable under the act, should not do the same in the case of works

16  not copyrightable."  *Id*.

17     This was the state of the common law less than seven years later, in mid-

18  1947,[11] when California first revised Civil Code section 983. The new version of

19  that provision, which remained in effect throughout the period when the Turtles

20  made records, said:

21     If the owner of a composition in letters or arts *publishes it* the

22     same may be used in any manner by any person, without

23

24  [10] New York courts overruled *Whiteman* in the 1950s.  *See Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, No. 13-cv-05784 (S.D.N.Y., Dec. 12, 2014), at 7.

25

26  [11] The *Whiteman* decision—which "opened the door for the unrestricted, unauthorized, and uncompensated use of phonograph records on radio stations"—is in fact widely understood to have been a leading cause of the famous American Federation of Musicians strike against recording new phonographs, which lasted 27 months from 1942 to 1944.  *See* U.S. Copyright Office, *Performance Right in Sound Recordings*, at 654 (1978) (describing the strike as the union's "solution" to *Whiteman* under the leadership of James Petrillo).

27

28

responsibility to the owner insofar as the law of this State is concerned.

*See* Act of July 9, 1947, c. 1107, 1947 Cal. Stat. 2546; Cal. Civ. Code § 983 (West 1947) (emphasis added).  The legislative history of the 1947 revision makes clear that its purpose was to "bring the California statute into accord with federal law and judicial precedent within and without California."  *See* Leg. Assemb. B. 566, 57th Gen. Sess. (Cal. 1947) ("1947 Leg. Hist.") (attached hereto as App. Ex. 10), at 25.  That is why the Legislature substituted the phrase "publishes it"—tracking the common law concept of "publication"—for the slightly distinct phrase "makes it public" in the old version of the law.[12]  The impetus for the edit was simply to avoid potential confusion, rather than effectuate a substantive change in prevailing doctrine; as the legislation's sponsor explained, "[o]ur courts have [in practice] construed the [1872 version of the] California statutes in accord with judicial precedent throughout the United States."  *Id*. at 37.  To illustrate that point, he cited a 1936 Second Circuit opinion by Judge Hand as an example of a case that reflected the accepted approach to interpreting both section 983 and the common law principles it embodied.  *Id*.  There is no question, then, that the amendment was intended, out of an abundance of caution, to confirm that California "copyright divestiture" doctrine was to follow the widely accepted common law of "publication," as it stood in 1947.  Any sound recording published in that era lost its California copyright protection.

The law in California then remained unchanged until 1982,[13] when the state Legislature simultaneously amended both section 980 (which had granted a California copyright to "[t]he author or proprietor of any composition in letters or

---

[12] As the sponsor of the legislation explained at the time, the 1872 version of "[s]ection 983 is ambiguous because a legal 'publication' of a work destroys its common law rights but an author may 'make it public' by try-out performance . . . without having legally 'published' it."  1947 Leg. Hist. at 31.

[13] A 1949 revision recodified the same text into subsection (a) under section 983. *See* 1949 Cal. Stat., c. 921, p. 1686, § 4.

arts" in the first instance) and section 983.  The 1982 revision was a clean-up bill, designed to "repeal existing provisions of state copyright law which have become obsolete in view of the preemption thereof by the Federal Copyright Act of 1976." 1982 Leg. Hist. at 45.  The 1976 Act had made federal law newly applicable to *any* works "fixed in a tangible medium of expression," regardless of whether they were published or unpublished.  *See* 17 U.S.C. § 102(a).  And it contained a sweeping preemption clause, 17 U.S.C. section 301, that expressly overrode the ability of states like California to provide the protection they had historically accorded unpublished works.  The California Legislature thus undertook to "repeal those statutes preempted by federal law," and replace them with narrower provisions governing the modest subject matters still eligible for state regulation.  1982 Leg. Hist. at 23.

One of those replacements was a new section 980(a), which in clause (2) addressed sound recordings made before 1972.  That provision, the legislative digest made clear, was intended to do nothing more than "maintain[] rights and remedies in sound recordings fixed prior to February 15, 1972."  *See* 1982 Leg. Hist. at 14.  The text provided, in full:

> The author of an original work of authorship consisting of a sound recording initially fixed prior to February 15, 1972, has an exclusive ownership therein until February 15, 2047, as against all persons except one who independently makes or duplicates another sound recording that does not directly or indirectly recapture the actual sounds fixed in such prior sound recording, but consists entirely of an independent fixation of other sounds, even though such sounds imitate or simulate the sounds contained in the prior sound recording.

Cal. Civ. Code § 980(a)(2).

At the same time, the 1982 statutory revision deleted the 1947 version of

section 983, which had always "terminat[ed] common law copyright upon publication of the work." *See* 1982 Leg. Hist. at 54.  This amendment was necessary, the State Bar explained, because the new federal copyright law "abolish[ed] a former distinction between state protection for unpublished works and federal protection for published works." *Id.* at 55; *see also Klekas v. Emi Films, Inc.*, 150 Cal.App.3d 1102, 1108-09 (1984) ("Congress, by passing the 1976 Act, intended to abolish th[e] dual system of common-law copyright for unpublished works and statutory copyright for published works[.]").  Going forward, no new *unpublished* works could be eligible for state law copyright protection at all, because federal law, to the exclusion of state law, would newly cover those works no less than published ones.  So it was pointless to leave a statutory provision on the books *extinguishing* state protection upon publication.

There was "no known opposition to the bill." 1982 Leg. Hist. at 50.  That resounding silence stands in stark contrast to the decades of rancorous public policy debate and legislative wrangling over whether to *establish* a performance right for sound recordings.[14]  If the 1982 revision of California Civil Code section 980 resurrected protection for sound recordings whose state copyright protection had previously been terminated by publication, it did so without anyone in the broadcasting industry so much as writing a letter to the editor against that fundamental transformation of the California copyright regime.

---

[14] *See, e.g., General Revision of the Copyright Law*, Hearings before the H. Comm. on Patents, 72nd Cong., at 19 (1932) (statement of Chairman Sirovich) ("[W]e are going to have quite a controversy between the . . . people who are producing records and kindred and similar devices protesting against the radio companies that are using the mechanical devices and playing them over the radio without any compensation to the . . . people who are making them."); *Performance Royalty*, Hearings before the S. Subcomm. on Patents, Trademarks and Copyrights of the S. Comm. on the Judiciary, 94th Cong., at 1 (1975) (statement of Senator Scott) ("Today we are holding hearings on a matter of great importance and interest to all of us. We will consider whether artists . . . should be compensated when recordings of their work are played publicly. . . . I have supported this extension of the performance royalty concept for the past 30 years.  . . . The broadcasting industry has been a major opponent.").

**ARGUMENT**

The state law rights Plaintiff asserts do not exist.  That is why the entire music industry does not recognize and never has recognized any legal obligation to pay royalties for the public performance of sound recordings fixed before 1972, as reflected in decades' worth of judicial decisions, legislative actions, and sworn testimony by the highest ranking officials in the field.  In California, the principal explanation for that indisputable, established practice is that, by statute, copyright protection was never available for any work once it was "published," *i.e.*, made available to the public by the author.  Courts in this state have always understood that rule to extinguish section 980 protection when a recording is distributed in commerce—as all of the recordings at issue in this case were.  The 1982 clean-up bill codifying the statutory provision that Flo & Eddie rely on here did not, and could not, have the effect of taking every sound recording that had ever been sold in California—and thus had its state law copyright terminated—and resurrecting its protection.

By contrast, for decades, the U.S. Supreme Court has recognized the First Amendment interest Pandora invokes here.  Plaintiff seeks to enjoin a broadcaster from communicating media to the public.  The anti-SLAPP law was created precisely for baseless attacks like this.  The Court should thus grant this section 425.16 motion.

# I.  PLAINTIFF'S CLAIMS ARISE FROM PANDORA'S PROTECTED ACTIVITY

The anti-SLAPP statute allows defendants to strike improbable claims asserting liability arising from "any . . . conduct in furtherance of the exercise of the constitutional right . . . of free speech in connection with a public issue or an issue of public interest."  Cal. Civ. Proc. Code § 425.16(e)(4) (defining actions covered by section 425.16(b)(1)).  That category encompasses all of Pandora's conduct that Flo & Eddie allege is unlawful.

1    "There is no doubt that entertainment, as well as news, enjoys First

2    Amendment protection." *Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562,

3    578 (1977).  More specifically, "[m]usic, as a form of expression and

4    communication, is protected under the First Amendment." *Ward v. Rock Against*

5    *Racism*, 491 U.S. 781, 790 (1989).  That protection extends not just to the original

6    creators of musical works and recordings, but also to third parties who disseminate

7    them; thus "motion pictures, programs broadcast by radio and television, and live

8    entertainment, such as musical and dramatic works, [all] fall within the First

9    Amendment guarantee." *Schad*, 452 U.S. at 61.  Pandora's streaming music to its

10   users is, beyond dispute, an exercise of First Amendment rights.  *See Cinevision*

11   *Corp. v. City of Burbank*, 745 F.2d 560, 567-68 (9th Cir. 1984) (making expressive

12   materials available to the public "further[s] a first amendment interest").

13   All of the Free Speech conduct at issue in this case is "in connection with a

14   public issue or an issue of public interest" within the meaning of the anti-SLAPP

15   law.  "Like the SLAPP statute itself, the question whether something is an issue of

16   public interest must be 'construed broadly.'" *Hecimovich v. Encinal School Parent*

17   *Teacher Org.*, 203 Cal.App.4th 450, 464 (2012) (quoting Cal. Civ. Proc. Code

18   § 425.16(a)).  First Amendment expression is deemed to qualify whenever it

19   "concerns a topic of widespread public interest and contributes in some manner to

20   a public discussion of the topic." *Stewart v. Rolling Stone LLC*, 181 Cal.App.4th

21   664, 677 (2010).  The Ninth Circuit has held that a suit asserting liability from the

22   public dissemination of a rock band's recorded performances satisfies this

23   standard.  *See Cusano v. Klein*, 473 Fed. Appx. 803, 804 (9th Cir. 2012).  That is

24   no different than what Pandora is accused of having done here: disseminating

25   "recordings that comprise the historical backbone of the music industry" and "have

26   defined generations."  Compl. ¶ 3.  The core premise of Plaintiff's complaint is that

27   Pandora shares early-to-mid 20th century recordings with the public *precisely*

28   *because these are works of tremendous cultural value, i.e.*, "of public interest."

1   *See Stewart*, 181 Cal. App. 4th at 678 (listing band names in a magazine is an

2   exercise of Free Speech rights in connection with an "issue of public interest"); *No*

3   *Doubt v. Activision Publ'g, Inc.*, 192 Cal.App.4th 1018, 1027 (2011) (same for

4   using band members' likenesses in a video game).

5        Pandora's streaming music to users—the activity that Flo & Eddie say gives

6   rise to liability—thus arises from "protected activity" under the anti-SLAPP law.

7   In fact, California Code of Civil Procedure section 425.17(d)(2) expressly

8   recognizes that anti-SLAPP motions *can* be brought to strike lawsuits *of exactly*

9   *this type,* specifically including "[a]ny action against any person or entity based

10  upon the . . . dissemination, exhibition . . . or other similar promotion of any . . .

11  musical . . . or artistic work[.]"  Litigation against a music-streaming company over

12  its public performances of famous recorded songs plainly fits that category.[15]

13       Plaintiff's claims arise from Pandora's exercise of constitutional rights

14  protected by California Code of Civil Procedure section 425.16(b)(1).  Pandora

15  thus carries its burden under the first prong of the anti-SLAPP inquiry.

16  **II.   PLAINTIFF CANNOT MEET ITS BURDEN TO PROVE A
       PROBABILITY OF PREVAILING ON ITS CLAIMS**

17

18       Flo & Eddie cannot carry their burden under the second prong of the anti-

19  SLAPP inquiry to show a "probability of prevailing" on their claims.

20       **A.   California Copyright Protection Ended Decades Ago For All Of
           The Sound Recordings Plaintiff Is Suing Over**

21

22       Plaintiff's section 980(a)(2) cause of action fails because California law

23  divested its sound recordings of state copyright protection when the Turtles

24  deliberately sold those recordings in stores in the 1960s.  The Complaint alleges

25  that the works in suit include *inter alia* that band's "string of Top 40 hits," which

26  Flo & Eddie "has been . . . engaged in the business of distributing, selling and/or

27   

---

28  [15] We do not suggest that Plaintiff's suit is otherwise a qualifying "action brought
    solely in the public interest" under section 425.17(b).  It is not.

1   licensing." Compl. ¶¶ 7, 9. These sound recordings were thus "publish[ed]"

2   within the meaning of former California Civil Code section 983(a). As a result, the

3   protection for those "composition[s] in letters or arts," Cal. Civ. Code § 980(a)

4   (West 1947), ended decades ago. The 1982 enactment of section 980(a)(2)

5   changes nothing about this analysis; that revision did not, and could not, have the

6   effect of flipping the copyright status of the entire corpus of all sound recordings

7   ever published in California, by newly putting them back under copyright

8   protection until 2047.

9       *Lone Ranger* controls this case. In that binding 1984 precedent, the Ninth

10   Circuit held that sound recordings made in California in the 1950s and licensed for

11   commercial use in the 1960s had been stripped of their state law copyright

12   protection under the version of Civil Code section 983(a) in effect during the time

13   of the works' initial "commercial distribution." *See Lone Ranger*, 740 F.3d at 725-

14   26. The owner's acts of "publishing [the audio recordings] in radio broadcasts and

15   sales for home use" satisfied the section 983(a) requirements "for divesting state or

16   common law copyright." *Id*. So the plaintiff had no cognizable "intangible

17   property interest in the performances recorded" at all. *Id*. at 725. Like the sound

18   recordings in *Lone Ranger*, the sound recordings here were all "publish[ed] in

19   radio broadcasts and sales for home use" in the 1960s, and thus were divested of

20   protection under then-operative section 983(a). *See also Blanc v. Lantz*, No.

21   547157, 1949 WL 4766, at *5 (Cal. Super. Ct. Sept. 30, 1949) (distribution of a

22   "laugh track" in a movie divests protection of the recording); *McIntyre v. Double-A

23   Music Corp.*, 166 F.Supp. 681, 682 (C.D. Cal. Sept. 30, 1958) ("distribution to the

24   general public of hundreds of thousands of phonograph records . . . destroyed

25   whatever rights [plaintiff] had in the arrangement" embodied in the records).

26       It made no difference to the outcome in *Lone Ranger* that, as the Court

27   noted, California's legislature subsequently enacted section 980(a)(2) "codifying

28   ownership rights in sound recordings fixed before 1972." *Id*. If that provision

1  *resurrected* protection previously *vitiated* under section 983(a), then the case

2  should have come out the other way on the state copyright issue; the Ninth Circuit

3  should have held that irrespective of the "publication" of the recordings in the

4  1960s, the plaintiff's "intangible property interest" came back to life.  It did not.

5  Even if this Court were writing on a clean slate, the same outcome would

6  independently be warranted in this litigation.  The 1982 amendments to section 980

7  did not override 100 years' worth of statutory divestiture by publication in

8  California.  The law passed *without opposition*.  *See* 1982 Leg. Hist. at 50.  Its

9  express purpose was simply to "*maintain* rights and remedies" where they

10  previously stood.  *See id*. at 14 (emphasis added).  Under California law, "the

11  touchstone of statutory interpretation" is "the probable intent of the Legislature."

12  *People v. Molina*, 120 Cal.App.4th 507, 513 (2004).  "The words of the statute

13  must be construed in context, keeping in mind the statutory purpose."  *Kane v.*

14  *Hurley*, 30 Cal.App.4th 859, 862 (1994).  It contravenes these mandatory

15  interpretive rules to suggest that by enacting section 980(a)(2) in 1982, the

16  Legislature intended to fundamentally transform California's state copyright

17  system from one that for a century had no application at all to published works, to

18  one that retroactively defied that unbroken tradition by granting a new term of

19  protection to recordings that had been commercially distributed for fifty years or

20  more.[16]

---

[16] Such a regime would have been altogether unworkable in any event.  Who, precisely, would own these zombie copyrights?  The performing artists?  Which ones—all of them jointly?  The label?  The *least* likely candidate would be some alleged former third-party assignee of those rights, like Plaintiff here.  And no conceivable policy rationale could have justified such an unprecedented decimation of the public domain.  *Cf. Golan v. Holder*, 132 S. Ct. 873, 894 (2012) (explaining that a much more limited legislative effort to bring a narrow category of foreign-authored works back under federal copyright protection in the 1990s— with elaborate carve-outs for "reliance parties" and others whose businesses had been built on using the works—was justified by the need for "compliance with our international obligations").  Resurrecting protection for recordings going back to the earliest days of the medium would thus have created an impossible-to-administer system of rights, owned in large part by heirs of artists or record label executives long since deceased, for no discernible public policy reason.

This is not to say that the Turtles, or their label, derive no utility whatsoever from section 980(a)(2).  To the contrary, if the band or its successor-in-interest has a collection of *unpublished* recordings, including live performances documenting "one of the most influential bands of the 1960s," Compl. ¶ 7, those presumably valuable works remain protected by state copyright law until 2047.[17]  Their section 980(a)(2) rights are very much intact.

Section 980(a)(2) cannot, however, serve as the basis for a copyright infringement claim today for records that were *published* decades ago.  That provision partook of the 100-year statutory tradition in California of protecting only unpublished works, rather than reversing it.  There is no state law copyright protection today for Turtles recordings sold in stores with the rightsholder's authorization and played on the radio in the 1960s.  Plaintiff's first cause of action thus fails as a matter of law.

## B.   California Has Never Recognized A Public Performance Right For Sound Recordings

Even if the preceding argument were not dispositive of the issue—that is, even if Plaintiff's works actually were still covered by a California copyright, rather than having had all such protection divested by publication—Flo & Eddie would still lose on their section 980 claims.  California does not recognize, and never has recognized, any "public performance" right that would make it illegal for terrestrial radio stations and companies like Pandora to play recordings without a license from the state law copyright holder.  That is one of the reasons why no court, in the 25 years after section 980(a)(2) became law, ever identified such a right.[18]  And it (partially) explains the universal consensus, embodied *inter alia* in

---

[17] Pandora, of course, has never had access to recordings like those.  They are not among the works in suit.  *See* Compl. Schedule A.

[18] *Cf. Capitol Records, Inc. v. Bluebeat, Inc.*, 765 F. Supp. 2d. 1198, 1206 (C.D. Cal. 2010); *Bagdasarian Prods., LLC v. Capitol Records, Inc.*, No. B217960, 2010 WL 3245795 (Cal. Ct. App. Aug. 18, 2010), discussed in *Sirius*, 2014 WL 4725382, at *7-8; *see also Capitol Records, LLC v. Sirius XM Radio, Inc.*, No. BC

1   decades' worth of Congressional testimony by representatives of the recording

2   industry, that *there is no state law public performance right for sound recordings*.

3   *See*, *e.g.*, *The Digital Performance Right in Sound Recordings Act of 1995:*

4   *Hearing on H.R. 1506 Before the H. Judiciary Subcomm. on Courts & Intellectual*

5   *Property*, 104th Cong. (1995) (testimony Jason S. Berman, Chairman and CEO,

6   Recording Industry Association of America), 1995 WL 371088 ("Under existing

7   law [prior to creation of the federal digital audio transmission right], record

8   companies and performers . . . have no rights to authorize or be compensated for

9   the broadcast or other public performance of their works."). Pandora will not

10  belabor this argument, because the Court has made clear its position on these

11  matters in the recently decided *Sirius* case. *See Sirius*, 2014 WL 4725382, at *9.

12  We respectfully disagree with the decision there, and present Pandora's position to

13  preserve it.

14          The suggestion that the statutory phrase "exclusive ownership" must

15  invariably include a public performance right is inconsistent with the fact that state

16  law copyright protection necessarily *excludes* myriad rights of "ownership." For

17  example, no one would contend that it violates any state law right of distribution

18  for a used record store to sell a CD—even though California law nowhere codifies

19  the "first sale" doctrine recognized by the U.S. Supreme Court since 1908, *see*

20  *Bobbs-Merrill Co. v. Straus*, 210 U.S. 339 (1908), and expressly codified in the

21  federal copyright statute at 17 U.S.C. section 109. This accepted but implied

22  *limitation* on the rights afforded by Civil Code section 980(a)(2) shows that it is

23  not true that "exclusive ownership" necessarily confers every known right under

24  the sun. To the contrary, that phrase must be interpreted by reference to the

25  common law tradition it incorporated, which never included the "public

26  performance" right on which Plaintiff's case is based, just as it never included

27

28  520981 (Cal. Super. Ct. Oct. 14, 2014), at 6 (rejecting reliance on *Bluebeat* and
    *Bagdasarian* for the proposition that California copyright law affords a public
    performance right).

1    numerous other rights.

2    **C.    Plaintiff's Unfair Competition, Conversion, And**
     **Misappropriation Claims Fail Because Pandora Has Done**
3    **Nothing Wrong**

4        In *Sirius*, the Court's holding on Flo & Eddie's section 980 claim dictated

5    the outcome on all the remaining claims. *See* 2014 WL 4725382, at *11

6    ("Borrowing the violation of § 980(a)(2), the Court finds that this unlawful conduct

7    also constitutes a violation of the U[nfair] C[ompetition] L[aw.]"); *id.* (awarding

8    summary judgment on the conversion claim citing a "wrongful disposition" of the

9    "property right" consisting of the "ownership interest in the right to publicly

10   perform [Flo & Eddie's] sound recordings under § 980(a)(2)"); *id.* (awarding

11   summary judgment on the misappropriation claim because "Flo & Eddie has

12   proven injury to itself . . . in the same manner that it demonstrated damages under

13   conversion and the UCL"). Pandora, however, has shown that Flo & Eddie have

14   no viable section 980 cause of action, *inter alia* because they have no remaining

15   state law copyright interest in their recordings. *See supra* § II.A. Without the

16   section 980 claim, there is no "unfair competition" or "conversion" or

17   "misappropriation" to speak of.

18       That inescapable conclusion disposes of the Complaint's "reproduction" and

19   "distribution" claims no less than its "public performance" claims. As a matter of

20   federal law, Pandora's customer-focused business[19] cannot and does not do

21

22   _____

     [19] The Complaint briefly references the "Music Genome Project," an internal tool
     for analyzing and annotating songs to create the novel algorithm for predicting
23   listener preferences at the core of Pandora's business. It is unclear whether
     Plaintiff's non-copyright claims allege that this conduct is unlawful—but if they
24   did, those claims would necessarily fail. Any alleged use of recordings for these
     purposes is obviously a "fair use" under both federal and state doctrine, even to the
25   extent copyright law protects them. *See, e.g., Author's Guild, Inc. v. Hathi Trust*,
     755 F.3d 87, 97-101 (2d Cir. 2014) (compiling database of full texts of millions of
26   books a fair use); *Kramer v. Thomas*, 2006 WL 4729242, at *12 (C.D. Cal., Sept.
     28, 2006) (California copyright law uses federal "fair use" analysis). Moreover,
27   the permissibility of such use is *constitutionally required*. *See Golan*, 132 S. Ct. at
     890 (identifying fair use as one of the "traditional contours" of copyright
28   protection which makes it compatible with the First Amendment). So Pandora's
     alleged conduct here could never yield liability for misappropriation or

anything more with a sound recording than stream it to listeners; the end-user can neither pick which song she wants to hear at a given time, nor re-play on demand any already-streamed songs. *See supra* at 9-10 (discussing Pandora's obligations as a "non-interactive service" provider under 17 U.S.C. § 114). It would stretch "conversion" and "misappropriation" doctrine beyond recognition to conclude that any intermediate copy of a pre-1972 recording allegedly generated in the course of that process violates California state law *even though the recording is unprotected by copyright*. Holding Pandora liable on the allegations here would have the effect of taking a federally *authorized* business and *criminalizing* it under state law. *See People v. Sisuphan*, 181 Cal.App.4th 800, 813 n.12 (2010) ("[C]riminal conversion occurs when [the] defendant exercises dominion over property inconsistent with the owner's rights[.]"). That is not what these doctrines do.

Cases like *A&M Records, Inc. v. Heilman*, 75 Cal.App.3d 554 (1977) do not dictate or even suggest any contrary outcome. The defendant in that suit was in "the business of advertising and selling pirated records and tapes." *Id*. at 560. The court ruled, sensibly, that such conduct amounted to "the unfair business practice of misappropriation." *Id*. at 564. But that holding says nothing at all about whether playing songs on the radio (or its internet analogue), and taking the technological steps necessary to engage in those perfectly lawful "public performances," is somehow proscribed by California law.[20]

"Conversion is the *wrongful* exercise of dominion over the property of

---

conversion—even if those causes of action purported to encompass initiatives like the Music Genome Project, which they do not in any event.

[20] *Capitol Records, Inc. v. Erickson*, 2 Cal.App.3d 526 (1969), and *Lone Ranger* are similarly inapposite. In *Erickson*, the Court of Appeal upheld a preliminary injunction granted against an openly piratic copier and distributor of new releases by Capitol Records. 2 Cal.App.3d at 537. That hardly means that an alleged intermediate copy made to carry out a perfectly lawful broadcast can give rise to a viable misappropriation claim. *Lone Ranger* affirmed liability on tag-along state law claims for conversion and unfair competition accompanying a *successful* federal infringement action. *See* 740 F.2d at 723, 726. It nowhere suggests that pursuing a perfectly lawful business model in an industry tightly regulated by federal law can somehow give rise to the same state claims.

1  another." *Burlesci v. Petersen*, 68 Cal.App.4th 1062, 1066 (1998) (emphasis

2  added). "Misappropriation is the *wrongful* taking of property." *Twin City Fire Ins.*

3  *Co. v. Ennen*, 64 Fed. Appx. 47, 48 (9th Cir. 2003) (emphasis added). There is

4  nothing *wrongful* at all about Pandora's practice of streaming songs unprotected by

5  state copyright law to its users, for them to listen to once, in real time, as part of a

6  playlist beyond their control. Without any viable "predicate" cause of action, Flo

7  & Eddie's unfair competition claim under California Business and Professions

8  Code section 17200 fails as well. *See Chabner v. United of Omaha Life Ins. Co.*,

9  225 F.3d 1042, 1048 (9th Cir. 2000).

10  \*                  \*                  \*

11  Plaintiff cannot carry its burden under the anti-SLAPP law to show a

12  "probability of prevailing," because all of its claims fail as a matter of law.

13  ## CONCLUSION

14  For the foregoing reasons, Pandora respectfully asks the Court to grant this

15  anti-SLAPP motion striking all of the causes of action in the Complaint.

16

17

18  Dated:  December 19, 2014          Respectfully submitted,

19                                     LATHAM & WATKINS LLP

20

21                                     By:  */s/ Andrew M. Gass*

22                                          Andrew M. Gass
                                            James K. Lynch

23                                     Attorneys for Defendant

24                                     PANDORA MEDIA, INC.

25

26

27

28